JUDGE NATHAN

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DENNIS FEIGHAY, Individually and On Behalf of All Others Similarly Situated, | No **13 CV 6181** |
| | **CLASS ACTION** |
| Plaintiff, | |
| v. | **COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |
| TOWER GROUP INTERNATIONAL, LTD., MICHAEL H. LEE, WILLIAM E. HITSELBERGER, and WILLIAM F. DOVE, |  |
| Defendants. | **DEMAND FOR JURY TRIAL** |

Plaintiff Dennis Feighay ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Tower Group International, Ltd. ("Tower" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons other than defendants who purchased or otherwise acquired Tower securities between May 9, 2011 and August 7, 2013, both dates inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of the federal securities laws and to pursue remedies under §§ 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder against the Company and certain of its top officials and/or directors.

2.     Tower, headquartered in Hamilton, Bermuda, through its subsidiaries, underwrites insurance and reinsurance products in Bermuda, the United States, and London markets. The Company provides commercial, personal, and specialty insurance and reinsurance products. It offers personal insurance products to individuals; and commercial insurance products to small to medium-sized businesses through a network of retail and wholesale agents. The Company also provides specialty products on an admitted and non-admitted basis, as well as through a network of program underwriting agents. It delivers a range of product lines in various industries using various distribution channels.

3.     As with all insurance companies, customers and investors pay particular attention to a company's loss reserves in evaluating the stability of the insurer and ability to continue to be a successful insurance carrier in the future.

4.     During the Class Period, the Company engaged in a series of acquisitions and mergers intended to hide the size of its loss reserves, as well as engaged in improper accounting of these loss reserves, and its goodwill and tax accounts.

5.     On March 13, 2013, the Tower Group, Inc. (a predecessor firm to the Company) announced the closing of its merger with Canopius Holdings Bermuda, Ltd. ("Canopius Bermuda"). Under the terms of the agreement, upon closure of the merger, Tower Group, Inc. became an indirect wholly-owned subsidiary of Canopius Bermuda, which then changed its name to Tower Group International, Ltd.

6.     On June 3, 2013, the Company continued its acquisition streak by entering into an agreement to acquire American Safety Reinsurance, Ltd. (ASRe), the Bermuda-based reinsurance subsidiary of American Safety Insurance Holdings, Ltd. (ASI), from Fairfax Financial Holdings Limited (Fairfax Financial) for approximately $59 million.

7.     Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) defendants' were improperly accounting for the Company's loss reserves; (ii) defendants' were improperly accounting for the Company's good will and tax accounts; (iii) the Company lacked the necessary internal controls over financial reporting; and, (v) as a result the Company's financial statements were deficient and misleading at all relevant times.

8.     On August 7, 2013, after the close of market, the Company disclosed that it is postponing the release of its financial results for the second quarter of 2013. The Company stated that its management concluded that additional time is needed to review matters relating to the estimate of its loss reserves and, primarily due to the integration of the Canopius Bermuda merger, its allocation of goodwill and certain tax accounts.

9.     On this news, Tower securities declined $5.21 per share or nearly 25%, to close at $16.39 per share on August 8, 2013.

10.     As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

11.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78n(a) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5, 17 C.F.R. § 240.14a-9).

12.     This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

13.     Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1391(b), as Tower's securities are traded within this District.

14.     In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

15.     Plaintiff, as set forth in the attached Certification, acquired Tower securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosure.

16.     Defendant Tower is a Bermuda corporation with its principal executive offices located at Crown House, 4 Par-La-Ville Road Hamilton HM 08, Bermuda.  Tower's common stock trades on the NASDAQ under the ticker symbol "TWGP."

4

17.     Defendant Michael H. Lee ("Lee") is the Company's Chairman, President and Chief Executive Officer ("CEO").

18.     Defendant William E. Hitselberger ("Hitselberger") is the Company's Executive Vice-President and Chief Financial Officer.

19.     Defendant William F. Dove ("Dove") is the Company's Senior Vice-President, Chief Risk-Officer and Chief Actuary.

20.     The defendants referenced above in ¶¶ 17-19 are sometimes referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

21.     Tower, headquartered in Hamilton, Bermuda, through its subsidiaries, underwrites insurance and reinsurance products in Bermuda, the United States, and London markets. The Company provides commercial, personal, and specialty insurance and reinsurance products. It offers personal insurance products to individuals; and commercial insurance products to small to medium-sized businesses through a network of retail and wholesale agents. The Company also provides specialty products on an admitted and non-admitted basis, as well as through a network of program underwriting agents. It delivers a range of product lines in various industries using various distribution channels.

### Materially False and Misleading
### Statements Issued During the Class Period

22.     On February 29, 2012, the Company filed with the SEC its annual report for the period ending December 31, 2011 on a Form 10-K, signed by, among others, the Individual Defendants, and reported net premiums earned of $1.593 billion, loss and loss adjustment expenses of $1.055 billion, and net income of $72 million. The Company also reported

5

comprehensive income of $91.5 million or $1.47 per diluted share, and total loss reserves of $1.3 billion.

23.     Regarding accounting for its loss reserves the Company stated in its annual report the following:

> We are required to establish reserves for incurred losses that are unpaid, including reserves for claims and loss adjustment expenses, which represent the expenses of settling and adjusting those claims. These reserves are balance sheet liabilities representing estimates of future amounts required to pay losses and loss expenses for insured and/or reinsured claims that have occurred at or before the balance sheet date, whether already known to us or not yet reported. Our policy is to establish these losses and loss reserves after considering all information known to us as of the date they are recorded.
>
> Loss reserves represent our best estimate, at a given point in time, of the ultimate settlement and administration cost of claims incurred. For workers' compensation, our reserves are discounted for claims that are settled or expected to be settled as long-term annuity payments, and as of December 31, 2011 the total amount of this discount was $3.7 million, which relates to $232.2 million total reserves for workers' compensation. To estimate loss reserves, we utilize information from our pricing analyses, actuarial analysis of claims experience by product and segment, and relevant insurance industry information such as loss settlement patterns for the type of business being reserved.
>
> Since the process of estimating loss reserves requires significant judgment about a number of variables, such as fluctuations in inflation, judicial trends and changes in claims handling procedures, our ultimate liability may exceed or be less than these estimates. We revise reserves for losses and loss expenses as additional information becomes available and reflect adjustments, if any, in earnings in the periods in which they are determined.
>
> We engage independent external actuarial specialists, from time to time, to review specific pricing and reserving methods and results. We also engage an independent external actuarial specialist to opine on the statutory reserves that are recorded at our insurance subsidiaries

24.     On May 10, 2012, the Company filed a quarterly report for the period ended March 31, 2012 on a Form 10-Q with the SEC signed by, among others, the Individual Defendants, and reported net premiums earned of $420 million, loss expenses of $267 million and net income of $29.6 million or $0.53 per diluted share.

6

25.     On August 8, 2012, the Company filed a quarterly report for the period ended June 30, 2012 on a Form 10-Q with the SEC signed by, among others, the Individual Defendants and reported net premiums earned of $460 million, loss expenses of $349.7 million and a net loss of $18.3 million or $0.39 per diluted share.

26.     In its quarterly report the Company also commented on its loss reserves, stating:

The consolidated net loss ratio, which includes the Reciprocal Exchanges, was 76.0% and 61.2% for the three months ended June 30, 2012 and 2011, respectively. Excluding the Reciprocal Exchanges, the net loss ratio was 77.3% and 62.4% for the three months ended June 30, 2012 and 2011, respectively. The Reciprocal Exchanges' net loss ratio was 63.3% and 53.0% for the three months ended June 30, 2012 and 2011, respectively.

Incurred losses and LAE for the three months ended June 30, 2012 attributable to insured events of prior years were $59.0 million. Excluding the Reciprocal Exchanges, the incurred losses and LAE from prior accident years were $65.0 million. Excluding the Reciprocal Exchanges, there was net adverse loss development of $62.1 million in the Commercial Insurance segment and $2.9 million in the Personal Insurance segment for the three months ended June 30, 2012.

The increase in estimates of prior years' loss and loss expenses was the result of a comprehensive review of its loss reserves in the second quarter and strengthened prior accident year reserves by $65 million following an analysis of recent loss emergence that occurred during the first and second quarters of 2012. The reserve strengthening in the second quarter represents 4% of the company's consolidated loss reserves (excluding the reserves that are carried by the Reciprocal Exchanges).

The reserve strengthening relates primarily to unfavorable development in the company's Commercial Insurance segment arising from changes in estimated ultimate losses for accident years 2011 and prior. During the quarter Tower conducted detailed reserve studies for all lines using loss data through the first quarter of 2012 as well as reported claims during the second quarter, including analysis of the source of unusually high reported loss emergence for certain casualty lines, primarily workers' compensation and commercial automobile, observed during the first quarter of 2012.

The Reciprocal Exchanges reported favorable development on prior accident years of $6.0 million during the three months ended June 30, 2012.

27.     On November 9, 2012, the Company filed a quarterly report for the period ended September 30, 2012 on a Form 10-Q with the SEC signed by, among others, the Individual Defendants and reported net premiums earned of $430.7 million, loss expenses of $256 million and net income of $25.4 million or $0.56 per diluted share.

28.     On March 13, 2013, the Company filed with the SEC its annual report for the period ending December 31, 2012 on a Form 10-K/A, signed by, among others, the Individual Defendants, and reported net premiums earned of $1.72 billion, loss and loss adjustment expenses of $1.25 billion, and a net loss of $28.1 million or $0.73 per diluted share.

29.     On March 13, 2013, the Tower Group, Inc. also announced the closing of its merger with Canopius Holdings Bermuda, Ltd. Under the terms of the agreement, upon closure of the merger, Tower Group, Inc. became an indirect wholly-owned subsidiary of Canopius Bermuda, which and then changed its name to Tower Group International, Ltd. In connection with the merger Defendant Lee stated:

> After working diligently on the merger with Canopius Bermuda for more than one year, we are very pleased with the successful completion of this transformative and strategically important transaction. We expect this merger to be immediately accretive and to eventually allow us to achieve our long-term ROE target of 13 to 15%. From a strategic standpoint, we believe this merger will position Tower to build a profitable, diversified international specialty business that has the potential to create substantial long-term value for our stockholders. As a result of the merger, we will create an efficient Bermuda-domiciled holding company structure that will combine Tower's businesses with certain of Canopius's reinsurance business and give us access to U.S., Bermuda and Lloyd's markets. Finally, we also want to thank everyone who worked on this transaction, including the bankers and attorneys as well the staff and Board members from Canopius Group Limited and Tower Group.

30.     On May 10, 2013, the Company filed a quarterly report for the period ended March 31, 2013 on a Form 10-Q with the SEC signed by, among others, the Individual

8

Defendants and reported net premiums earned of $420.4 million, loss expenses of $274.6 million and net income of $3.8 million or $0.33 per diluted share.

31.     The statements referenced in ¶¶ 22 - 30 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts, which were known to defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) defendants' were improperly accounting for the Company's loss reserves; (ii) defendants' were improperly accounting for the Company's good will and tax accounts; (iii) the Company lacked the necessary internal controls over financial reporting; and, (v) as a result the Company's financial statements were deficient and misleading at all relevant times.

## THE TRUTH EMERGES

32.     On August 7, 2013, the Company disclosed in a press release that it is postponing the release of its financial results for the second quarter of 2013. The Company stated that its management concluded that additional time was needed to review matters relating to the estimate of its loss reserves and, primarily due to the integration of the Canopius Bermuda merger, its allocation of goodwill and certain tax accounts.

33.     The Company further stated that:

[M]anagement concluded that additional time is needed to review matters relating to the estimate of its loss reserves and, primarily due to the integration of the Canopius Bermuda merger, its allocation of goodwill and certain tax accounts. The Company is working to resolve these matters with the assistance of outside professionals. The Company cannot currently predict the length of time of its review.

The Company noted that, as a result of these matters, it expects to file a Form 12b-25 (Notification of Late Filing) with the United States Securities and Exchange Commission, as it does not expect to file its report on Form 10-Q for the quarter ended June 30, 2013 by the required filing date of August 9, 2013.

34.    Then on August 8, 2013 the Company published a press release expounding

further upon the delay in filing its quarterly report:

> Loss reserves. The Company has retained an independent actuarial firm to review
> selected areas of the Company's loss reserves as of June 30, 2013. This review
> process by an independent actuarial firm is typically conducted at year-end, but
> the Company will use the report of the outside actuarial firm in connection with
> establishing its loss reserves as of June 30, 2013. Based upon currently available
> information, the Company could record adverse reserve development of $60
> million to $110 million pre-tax.
>
> Taxes. Losses in the Company's U.S. operations are generally offset by a tax
> benefit of 35% of such loss. Based upon currently available information, the
> Company expects that 60% of anticipated losses from adverse loss reserve
> development will come from its U.S.-taxed businesses. The expected tax benefit
> from such U.S. losses will not be realized in the second quarter, but will only be
> recognized if the Company generates additional earnings in its U.S. businesses.
> The Company would use any such tax benefits to offset future U.S. taxable
> earnings and capital gains from the anticipated rebalancing of the Company's
> fixed income investment assets consistent with its new corporate structure.
>
> Goodwill. The Company revised its segment reporting in the second quarter of
> 2013 to reflect the changes to its corporate structure after the merger with
> Canopius Bermuda. As a result of this change in segment reporting, goodwill has
> been allocated to each business segment. To the extent that the loss reserve
> adjustment adversely impacts one segment, goodwill associated with that segment
> may be impaired, and a non-cash charge for such goodwill would be recorded.
> This analysis and charge, if any, will be calculated upon the completion of the
> reserve review.
>
> Net Income. The Company's operating results for the quarter will be driven by
> strong operating results from its Bermuda operations offset by the anticipated
> reserve strengthening. The Company will not record any tax benefit during the
> quarter to offset the anticipated losses in the U.S. The Company believes that at a
> reserve adjustment of $60 million, it would record operating earnings of between
> $.15 and $.20 per share, including a deferred tax valuation allowance of between
> $.35 and $.40 per share, and at a charge of $110 million its operating loss would
> be between $.80 and $.85 per share, including a deferred tax valuation allowance
> of between $.18 and $.23 per share. These estimates exclude the non-cash effect
> of any goodwill impairment.
>
> Timing for the release of second quarter results. The Company currently expects
> to announce its results for the second quarter of 2013 within 30 days.

Michael H. Lee, President and Chief Executive Officer, said, "During the second quarter, we continued to realize benefits from the CanopiusBermuda merger and our ongoing post-merger plan to enhance Tower's business model to position the company for long-term growth and increased profitability. We expect our results for the quarter to be driven by the strong growth and profitability of our newly established Bermuda operation. In the U.S., our proposed actions in the second quarter reflect our commitment to position our Company for long-term profitability. We expect this action will result in a tax benefit in the U.S., which we will not record in the second quarter, but may be able to offset against any future profits from our U.S. operations as well as future capital gains. In summary, we believe the strong profitability of our Bermuda operations and tax benefits generated by the loss reserve strengthening in the U.S, which we expect to gradually utilize in the future, will allow us to strengthen the Company. We are disappointed that we were not able to timely complete our closing for the second quarter to announce these results, but we believe our post-merger plan is working and will eventually allow us to achieve our long-term financial objectives."

35.     On this news, Tower securities declined $5.21 per share or nearly 25%, to close at $16.39 per share on August 8, 2013.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

36.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Tower securities during the Class Period (the "Class"); and were damaged thereby. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

37.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Tower securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds

or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Tower or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

38.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

39.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

40.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;

- whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Tower;

- whether the Individual Defendants caused Tower to issue false and misleading financial statements during the Class Period;

- whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Tower securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

12

41.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

42.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Tower securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Tower securities between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

43.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## COUNT I

### (Against All Defendants For Violations of
### Section 10(b) and Rule 10b-5 Promulgated Thereunder)

44.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

45.     This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

46.     During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Tower securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Tower securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

47.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to

influence the market for Tower securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Tower's finances and business prospects.

48.     By virtue of their positions at Tower, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

49.     Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or directors of Tower, the Individual Defendants had knowledge of the details of Tower's internal affairs.

50.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Tower. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Tower's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements,

the market price of Tower securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Tower's business and financial condition which were concealed by defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Tower securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

51. During the Class Period, Tower securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Tower securities at prices artificially inflated by defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Tower securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Tower securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

52. By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

53. As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure

16

that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the
Exchange Act Against The Individual Defendants)**

54.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

55.     During the Class Period, the Individual Defendants participated in the operation and management of Tower, and conducted and participated, directly and indirectly, in the conduct of Tower's business affairs.  Because of their senior positions, they knew the adverse non-public information about Tower's misstatement of income and expenses and false financial statements.

56.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Tower's financial condition and results of operations, and to correct promptly any public statements issued by Tower which had become materially false or misleading.

57.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Tower disseminated in the marketplace during the Class Period concerning Tower's results of operations.   Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Tower to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Tower

17

within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Tower securities.

58.    Each of the Individual Defendants, therefore, acted as a controlling person of Tower.  By reason of their senior management positions and/or being directors of Tower, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Tower to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Tower and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

59.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Tower.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

18

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:   September 3, 2013

Respectfully submitted,

**POMERANTZ GROSSMAN HUFFORD DAHLSTROM & GROSS LLP**

Jeremy A. Lieberman
Leslie F. Portnoy
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
jalieberman@pomlaw.com
lfportnoy@pomlaw.com

**POMERANTZ GROSSMAN HUFFORD DAHLSTROM & GROSS LLP**
Patrick V. Dahlstrom
Ten South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184
pdahlstrom@pomlaw.com

*Attorneys for Plaintiff*

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.   I, _____Dennis Feighny_____, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.   I have reviewed a Complaint against Tower Group International, Inc. ("Tower Group" or the "Company"), and authorize the filing of a comparable complaint on my behalf.

3.   I did not purchase or acquire Tower Group securities at the direction of plaintiffs counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.   I am willing to serve as a representative party on behalf of a Class of investors who purchased or acquired Tower Group securities during the class period, including providing testimony at deposition and trial, if necessary.   I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.   To the best of my current knowledge, the attached sheet lists all of my transactions in Tower Group securities during the Class Period as specified in the Complaint.

6.   During the three-year period preceding the date on which this Certification is signed, I have not sought to serve as a representative party on behalf of a class under the federal securities laws.

7.   I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.   I declare under penalty of perjury that the foregoing is true and correct.

Executed ___8/ 29/~~00~~ 20/3___
                  (Date)

_____
                  (Signature)

_____
            (Type or Print Name)

SUMMARY OF PURCHASES AND SALES

| DATE | PURCHASE OR SALE | NUMBER OF SHARES | PRICE PER SHARE |
|------|------------------|------------------|-----------------|
| 7-1-2013 | $1136.39 | 55 | $20.48 |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |